UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re: MICHAEL VINCENT BRADLEY, No. 25-10514-j7

Debtor.

# MEMORANDUM OPINION

The Chapter 7 Trustee ("Trustee") objects to Debtor's claim of an exemption in a motorcycle (the "Motorcycle") and moves the Court to compel Debtor to turn the Motorcycle over to the Trustee.[1] The dispute concerns whether Debtor transferred an interest in the Motorcycle prepetition by granting or attempting to grant a security interest in the Motorcycle, and whether the Trustee's avoidance of the lien as a security interest (or attempted grant of security interest) deprives the Debtor of an exemption in the Motorcycle pursuant 11 U.S.C. § 522(g).[2] Also at issue is whether Debtor is judicially estopped from denying that he created a valid a security interest in the Motorcycle or waived any contrary position by failing to intervene in the Trustee's lien avoidance action. For the reasons explained below, the Court will overrule the Trustee's objection to the Debtor's claimed exemption in the Motorcycle and to the Debtor's Amended Schedules D and E/F and will deny the Trustee's Motion to Compel Turnover of the Motorcycle.

## PROCEDURAL HISTORY

The Trustee and Debtor filed a Stipulation Regarding Facts (Doc. 56) in which they stipulated that they waived the right to an evidentiary hearing, and, pursuant to an order of the Court, asked the Court to decide the Objections and the Motion to Compel Turnover

---

[1] The related contested matters now before the Court are the Trustee's Objection to Debtor's Claimed Exemption (Doc. 22); the Trustee's Limited Objection to Debtor's Amended Schedule D and E/F (Doc. 33) (together the "Objections"); and the Trustee's Motion to Compel Turnover (Doc. 38).
[2] "Section," "§," or "§§," refers to title 11 of the United States Code, unless otherwise indicated.

based on the stipulated facts, the exhibits stipulated into evidence, and judicial notice of the documents filed of record in this bankruptcy case and in Adversary Proceeding No. 25-1031 (the "Adversary Proceeding") pending before this Court.

With the consent of the parties, the Court admits in evidence Exhibit A (the title to the Motorcycle); Exhibit B (a transcript of the § 341(a) meeting conducted in this case); Exhibit C (a report issued by Taxation of Revenue, Motor Vehicles Division relating to the Motorcycle); and Exhibits D and F (email correspondence).

Trustee filed a brief in support of the Objections and Motion to Compel Turnover; the Debtor filed a response; and the Trustee filed a reply. (Docs. 58, 60, 61).

Trustee commenced the Adversary Proceeding under §§ 544, 550, and 551 naming Debtor's grandfather, Robert M. Quintana Sr., as the sole defendant, to avoid a lien represented by a security interest in the Motorcycle granted to the defendant on the ground that the lien was unperfected. Trustee asked the Court to preserve the avoided lien for the benefit of the estate. The Court entered a default judgment against Mr. Quintana avoiding the alleged lien, determining that the avoided lien is property of the bankruptcy estate, and authorizing the Trustee to liquidate the Motorcycle subject to further motion and notice. *See* AP Doc. 13.[3] Debtor chose not to seek to intervene in the Adversary Proceeding.

FINDINGS OF FACT

Based on the Stipulation Regarding Facts, the exhibits admitted in evidence, and the Court having taken judicial notice of the dockets in this bankruptcy case and in the Adversary Proceeding and the documents filed on those dockets, the Court FINDS:

---

[3] References to "AP Doc. ____" are to documents filed in the Adversary Proceeding.

Before Debtor filed his chapter 7 bankruptcy case, Debtor entered into an unwritten loan agreement ("Loan") with his grandfather, Robert M. Quintana Sr., wherein the Debtor desired to borrow $20,000.00 to purchase the Motorcycle, a 2024 BMW S 1000 RR (VIN: WB10E630XR6K44276). No part of the foregoing loan agreement was in writing. Mr. Quintana funded the $20,000.00 Loan and the Debtor used the Loan proceeds to purchase the Motorcycle on or before about March 14, 2025. Despite the lack of any written agreement with Mr. Quintana to be a lienholder in the Motorcycle, Debtor originally believed Mr. Quintana to be a lienholder. To evidence the parties' intent to pledge the Motorcycle as collateral for the Loan, Mr. Quintana's name and address was handwritten onto the lienholder portion of the title to the Motorcycle (the "Title"). *See* Exhibit A. The Title identified Mr. Quintana as Second Lienholder. Debtor did not sign the Title.

Debtor believes that Debtor's uncle, who lives with Mr. Quintana, has a history of claiming that items that belong to Mr. Quintana actually belong to Debtor's uncle. This belief motivated the Debtor to place the Title to the Motorcycle in the custody of Debtor's mother, whom Debtor believed would keep it safe for Mr. Quintana.

Based on these actions, Debtor believed that (1) Mr. Quintana had a valid security interest in the Vehicle, and (2) Mr. Quintana's name on the Title to the Motorcycle, plus the entrustment of the Title to Debtor's mother, were sufficient to perfect Mr. Quintana's security interest in the Motorcycle. These beliefs were erroneous but sincere.

Debtor filed a voluntary petition under Chapter 7 of Title 11, United States Code, on April 29, 2025 ("Petition Date"). Philip J. Montoya is the duly appointed and acting Trustee in this case.

On or about April 29, 2025, Debtor filed his original Schedules of Assets and Liabilities

("Schedules"). Debtor disclosed ownership of four vehicles in his Schedules, including the Motorcycle. Schedule A/B, ¶3.1-3.4 (Doc. 1). Debtor valued his interest in the Motorcycle at $16,000. Debtor initially used his vehicle exemption to exempt a different vehicle (a 2012 Suzuki RMZ450). Schedule C, ¶2. Debtor, on his initial Schedule D, in the disclosure of his debt to Mr. Quintana, identified the Vehicle beneath the prompt: "Describe the property that secures this claim[.]" Schedule D, ¶2.4. Debtor checked the box that the secured claim of Mr. Quintana was pursuant to an agreement he had made (such as mortgage or secured car loan). *Id.* On or about April 29, 2025, the Debtor filed a Statement of Intention indicating he intended to "[r]etain the [Vehicle] and enter into a reaffirmation agreement" with Mr. Quintana. (Doc. 3). Debtor signed both the Schedules and Statement of Intention.

On or about May 29, 2025, Debtor and his counsel appeared at the § 341 meeting of creditors ("§ 341 meeting"). Debtor was placed under oath at the § 341 meeting and swore he would tell the truth under penalty of perjury. Debtor swore that he had read the Schedules and that they were accurate and correct. At the § 341 Meeting, the Debtor also testified that: (i) he was current on his payments to Mr. Quintana on the Motorcycle, and (ii) he had paid "around three thousand dollars" to Mr. Quintana.

Nephi D. Hardman, counsel for the Debtor, stated at the § 341 meeting: "And Phil, I will point out that the grandfather is the secured lender on the [M]otorcycle. So those payments for the grandfather, I guess the debtor can clarify but perhaps this might be a good time to get the debtor to clarify whether those payments were for the [M]otorcycle loan." Debtor then clarified that the payments were for the Motorcycle because Mr. Quintana leant him the money to purchase it and he was paying him back.

Debtor further testified at the § 341 meeting that (i) his mother was holding the Title in

safekeeping for Mr. Quintana; (ii) "[M]y mother is in hold of [the Title to the Motorcycle] because my grandfather is older. My grandfather is 96. So . . . she holds the [T]itle for him in safekeeping because there's an issue where he lives that could -- someone could potentially get him for identity theft. And so in security of that [T]itle, my mother holds it for him;" and (iii) that Debtor's name was on the Title with Mr. Quintana's name on the Title as lienholder.

At the § 341 meeting, Trustee requested a copy of the Title to the Motorcycle. Debtor's counsel then interjected and said he had a picture of the Title he could send to the Trustee. Debtor was not asked at the § 341 meeting if a security agreement existed between him and Mr. Quintana, and Debtor did not speak to this point at all. Debtor produced a picture of the Title (Exhibit A).

On or about June 12, 2025, Trustee obtained a MVD report for the Motorcycle, which did not show a perfected lien in favor of Mr. Quintana (Exhibit C). The MVD report does not mention Mr. Quintana in any capacity.

On or about June 13, 2025, Trustee filed his report of assets. On or about June 17, 2025, Trustee filed his Notice of Deadline to File Proof of Claim. (Doc. 13). On or about June 20, 2025, Debtor filed amendments to his schedules, including amendments to his Schedule C as well as an amended Statement of Intention. (Docs. 15 and 20). Debtor signed the foregoing amendments. Debtor's Amended Schedule C claims an exemption in the Motorcycle. (Doc. 15). Trustee filed an objection to the Amended Schedule C and predicated such objection on the Debtor's lack of equity in the Motorcycle. (Doc. 22).

Debtor filed an Amended Summary and Amended Schedules D and E/F on August 7, 2025. (Doc. 27). The Amended Schedule E/F, item 4.19 indicates that the debt to Mr. Quintana was "previously considered a secured debt" and asserts that "creditor's

lack of a written security agreement makes debt unsecure[d].” *Id*. at p. 10. Debtor signed the foregoing amendments.[4]

On September 5, 2025, Trustee commenced an avoidance action against Quintana. *See* Adversary Proceeding. (AP Doc. 1). Trustee did not name Debtor as a defendant in the Adversary Proceeding. The office of Trustee’s counsel emailed Debtor’s counsel courtesy copies of the following filings: Trustee’s Motion to Defer Adversary Filing Fee on September 11, 2025; Application for Entry of Default against Quintana on November 11, 2025, and again on November 13, 2025, and a copy of the corrected Judgment on December 4, 2025. *See* Exhibit D. Mr. Quintana did not participate in the Adversary Proceeding. The Court entered judgment by default in the Adversary Proceeding avoiding what was alleged to be an unperfected lien of Mr. Quintana in the amount of $20,000.00 pursuant to § 544 and preserving it for the benefit of the Estate pursuant to § 551 (the “Judgment” – AP Doc. 13).

On or about December 29, 2025, the office of Trustee’s counsel copied Debtor’s counsel on an email to the Court’s staff asking to vacate a hearing due to the entry of the Judgment avoiding the lien on the Motorcycle. The Adversary Proceeding did not seek declaratory relief or any other form of relief against the Debtor. Debtor did not intervene in the Adversary Proceeding against Mr. Quintana and has not sought to set the Judgment aside.

Trustee did not ask the Court to schedule a hearing on his objection to Debtor’s

---

[4] The Trustee and Debtor also stipulated to the following “facts” that the Court has not included in its findings because they are a recitation of the parties’ positions rather than a stipulation of facts:

> Debtor avows there has never been a written security agreement. Trustee concedes that he is unaware of any other documents, and has introduced none into the record, other than the Title (Exhibit A), the Schedules, the Statement of Intention and other documents filed with this Court by the Debtor, which Trustee asserts are written documents that describe the Debtor’s intent to create a security interest in a vehicle to secure a debt and describe the vehicle pledged as collateral. Debtor disputes that characterization but acknowledges the existence and authenticity of the Title, the Schedules, the Statement of Intention and other documents filed with this Court by the Debtor.

amendments filed August 7, 2025. On January 22, 2026, Trustee made demand on the Debtor to turn over possession of the Motorcycle. On January 25, 2026, Trustee filed his Motion to Compel Turnover. (Doc. 38).

## DISCUSSION

Trustee makes three arguments: first, the Trustee argues that Debtor transferred an interest in the Motorcycle which Trustee avoided for the benefit of the estate, thereby depriving Debtor of an exemption in the Motorcycle under § 522(g); second, Trustee argues that Debtor is judicially estopped from denying the existence of the security interest in the Motorcycle after repeatedly representing under oath that the Motorcycle secured his grandfather's claim in this bankruptcy case; and third, Trustee argues that Debtor waived any position that he did not transfer an interest in the Motorcycle by granting a security interest because Debtor failed to intervene in the Adversary Proceeding in which Trustee avoided the lien and/or because Debtor failed to timely seek to set aside the Judgment. The Court will address each of these arguments in turn.

### I. Whether Debtor transferred an interest in the Motorcycle

The parties agree that under § 522(g), Debtor would be deprived of an exemption against the Motorcycle only if the Trustee avoided a voluntary prepetition "transfer" by Debtor of an interest in the Motorcycle. The parties further agree that the grant of a security interest in an asset constitutes a "transfer" of an interest in the asset. Finally, the parties agree that if Debtor had granted a valid security interest in the Motorcycle to Mr. Quintana, the Trustee's avoidance of the security interest under § 544 and preservation of the avoided lien for the benefit of the estate would deprive Debor of an exemption against the Motorcycle.

The Court agrees that if Debtor transferred an interest in the Motorcycle to Mr. Quintana by granting him a lien, Debtor would not be entitled to an exemption against the Motorcycle because Trustee avoided the alleged lien pursuant to § 544 for the benefit of the estate.[5] Section 522(g) prevents a debtor from claiming an exemption in property transferred in a manner that gives rise to a trustee's avoiding powers and later recovered by the trustee, where the transfer was voluntary or where the transfer or property interest was concealed.[6]

The parties also agree that N.M.S.A. 1978, § 55-9-203 (2023), governs whether a security interest in the Motorcycle attached to the motor vehicle.[7] New Mexico has adopted Article 9 of the Uniform Commercial Code ("UCC"). *See* N.M.S.A. 1978, § 55-9-101 (2001) ("Chapter 55, Article 9 NMSA 1978 may be cited as the 'Uniform Commercial Code-Secured Transactions.'"). The parties do not dispute, and the Court agrees that the creation of a valid security interest in a vehicle under the UCC requires the debtor to sign an agreement.

One of the requirements under the UCC for a security interest to attach to collateral, including the Motorcycle, is that the debtor sign a security agreement that describes the collateral. *See* UCC 9-203(b)(3)(A) (requiring that "the debtor has signed a security agreement that provides a description of the collateral"); N.M.S.A. 1978, § 55-9-203(b)(3)(A) (2023) (same). Thus, for Debtor to create a valid security interest in the Motorcycle, Debtor would have to sign a security agreement.

---

[5] *See In re Lyne*, 677 B.R. 136, 143 (Bankr. W.D. Mo. 2026) ("Courts have consistently interpreted this language to prevent a debtor from claiming an exemption in recovered property if the debtor voluntarily transferred the property, concealed the transfer, or could not have avoided the lien under § 522(f)(1)(B) . . ." (citing *In re Hicks*, 342 B.R. 596, 598-99 (Bankr. W.D. Mo. 2006))).

[6] *Hitt v. Glass (In re Glass)*, 164 B.R. 759, 764 (9th Cir. BAP 1994), *aff'd,* 60 F.3d 565, 568–69 (9th Cir. 1995).

[7] Trustee does not dispute that, under New Mexico law, the grant of a security interest in a motor vehicle, including a motorcycle, is governed by the Article 9 of the Uniform Commercial Code.

The parties dispute whether Debtor granted a valid security interest in the Motorcycle by signing a security agreement and whether a defective grant of a security interest nevertheless constitutes a "transfer" of an interest. Debtor argues that Trustee did not avoid a "transfer" of an interest in the Motorcycle because Debtor did not sign a security agreement describing the Motorcycle as collateral, as required by N.M.S.A. 1978, § 55-9-203(b)(3)(A) (2023). Debtor reasons further that without the creation of a security interest in the Motorcycle in favor of Mr. Quintana, Debtor did not transfer an interest in the Motorcycle, and without such a transfer, there was no "transfer" for the Trustee to avoid. Trustee makes several arguments why Debtor nevertheless granted a security interest in the Motorcycle, which the Court will address in turn.

*Whether Debtor's bankruptcy schedules created a security interest in the Motorcycle*

Trustee argues that Debtor's prepetition signature on his bankruptcy Schedules satisfied the requirement that the Debtor has signed a security agreement. He argues that the bankruptcy schedules contain the essential attributes of a security agreement with respect to the Motorcycle: a writing signed by the Debtor describing the collateral and identifying the secured party by name and address. Trustee points out that the bankruptcy Schedules also show an intent on the part of Debtor to grant a security interest and that the secured party gave value in exchange for the security interest. Because the bankruptcy Schedules were filed with the petition commencing the bankruptcy case, Trustee reasons that Debtor necessarily signed the bankruptcy Schedules prepetition. Debtor did not respond to this argument because it was made for the first time in Trustee's reply brief.

While the Trustee's argument has some initial appeal, upon closer inspection the Court concludes that Debtor's signature on the bankruptcy Schedules does not satisfy the

requirement that Debtor sign a security agreement describing the collateral. As the name suggests, a security agreement is an agreement by the debtor; it is a voluntary pledge of collateral by the debtor to secure a loan. But filing bankruptcy schedules is a mandatory disclosure required by § 521. It is not voluntary and is not an agreement. Thus, "[a] debtor's Schedules filed pursuant to 11 U.S.C. § 521 cannot create a valid lien under State Law, resurrect an expired lien, or correct an improperly perfected one." *Weisbart v. Sanger Bank (In re Tilton)*, 297 B.R. 478, 485 (Bankr. E.D. Tex. 2003). Rather, the debtor's schedules merely put a chapter 7 trustee on notice to investigate to determine whether there was a properly created lien. *Id.* The schedules themselves do not create a lien. Nor can the schedules fill the gap in the creation of a valid security interest because the schedules themselves do not constitute an agreement by the debtor and are not voluntarily filed.

Here, Debtor mistakenly scheduled what was otherwise an unsecured claim as a secured claim based on his sincere but erroneous belief that he had granted Mr. Quintana a valid, perfected lien against the Motorcycle. That initial mistake cannot transform the indebtedness of Debtor to his grandfather into a debt secured by a lien.

*Whether several items considered collectively created a security interest in the Motorcycle*

Trustee next argues that a composite of documents can constitute a security agreement. Trustee reasons that the following, considered collectively, satisfy the requirement to create a valid security interest: (a) Debtor unequivocally testified at the § 341 meeting of creditors, under penalty of perjury, that he granted a consensual security interest in the Motorcycle to Mr. Quintana; (b) Debtor admits that Mr. Quintana financed his purchase of the Motorcycle and that he intended to grant a security interest in the Motorcycle to Mr. Quintana as collateral for payment of the purchase price; (c) the unsigned Title to the

Motorcycle lists Mr. Quintana as a holding a lien against the Motorcycle; (d) Debtor treated the debt as secured pre-petition and post-petition in his schedules, Statement of Intention and at the § 341 meeting; and (e) the Court entered a judgment in the Adversary Proceeding avoiding Mr. Quintana's security interest in the Motorcycle. Debtor counters that even when viewing these items collectively, they cannot constitute a security agreement because they do not satisfy the signature requirement.

Other than the bankruptcy schedules, which the Court has concluded do not satisfy the signature requirement, Trustee does not point to any document that Debtor signed prepetition that could constitute a signature on a security agreement. Debtor's testimony at the § 341 meeting and state of mind at the time of the transaction are not written documents. Even accepting that a composite of documents can, in some instances, constitute a security agreement, at least one of the documents within the composite must be signed by the Debtor prepetition. That requirement has not been satisfied.[8]

*Whether post-petition conduct can ratify an invalid pre-petition security agreement*

Trustee argues that the Debtor's post-petition conduct ratifies a pre-petition security agreement in the Motorcycle even if that agreement was imperfectly documented in the first instance. The Court is not persuaded by the ratification argument for several reasons. First, the doctrine of ratification does not apply here. Under New Mexico law, "[r]atification is the adoption or confirmation by a principal of an unauthorized act performed on its behalf by an agent." *Bd. of Cnty. Comm'rs of Cnty. of Bernalillo v. Chavez*, 2008-NMCA-028, ¶ 15, 143 N.M. 543, 547, 178 P.3d 828, 832 (quoting *Johnson & Johnson v. Taxation & Revenue Dep't,*

[8] The Court discusses below why the judgment in the Adversary Proceeding avoiding Mr. Quintana's security interest in the Motorcycle does not prevent Debtor from claiming an exemption in the Motorcycle.

1997–NMCA–030, ¶ 16, 123 N.M. 190, 194, 936 P.2d 872, 876). Mr. Quintana did not engage in any unauthorized act for Debtor to ratify.

Second, under UCC § 203(b)(2), to grant a security in collateral the debtor must have rights in the collateral or the power to transfer those rights. A chapter 7 debtor has no such rights or power post-petition with respect to property of the bankruptcy estate. Even if a chapter 7 debtor could grant a post-petition security interest in property of the bankruptcy estate with leave of court, no such leave was granted here.

Third, there are no statutory exceptions that allow a debtor to create a lien against property of the estate post-petition. The statutory exception set forth §§ 362(b)(3) and 546(b) relate to the post-petition *perfection* of a lien, not to the creation of lien. [9] And other statutory relation back circumstances do not apply to creation of a lien, such as when a creditor is granted a pre-petition claim as the result of a debtor's post-petition rejection of an executory contract.[10]

*Whether a defectively created lien nevertheless constitutes a "transfer" for avoidance purposes*

Trustee argues that a trustee may avoid a defectively created lien under § 544 because a defectively created lien constitutes a transfer as the term is defined in § 101(54). Trustee contends:

> [A]voidance actions under § 544 frequently arise precisely because a debtor granted an intended security interest that was defectively documented or unperfected. The Trustee's strong-arm powers exist to invalidate such interests as against the Bankruptcy Estate. Once reduced to judgment, the Trustee's

[9] *See Holbrook v. Country Mut. Ins. Co. (In re Burnett)*, 447 B.R. 634, 644 (Bankr. W.D. Okla. 2011) ("The exception contained in § 546(b) has been limited to post-petition perfection of statutory liens and security interests which relates back to a prepetition event and defeats the right of an intervening creditor. 11 U.S.C. §§ 362(b)(3) and 546(b) allow post-petition perfection of liens and interests in property of the debtor or the estate . . . .") (citations omitted).

[10] *See* § 502(g) (damages claim resulting from the rejection of an unexpired lease or executory contract is treated as a pre-petition claim against the bankruptcy estate).

avoidance powers determine the priority and enforceability of a transferred interest as against the Estate.[11]

The Debtor's argument ignores that the Bankruptcy Code defines the term "transfer" far more broadly than state commercial law defines the creation, attachment, or perfection of a security interest. Pursuant to 11 U.S.C. § 101(54), a transfer includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." Congress intentionally adopted an expansive definition designed to encompass virtually every method by which a debtor may relinquish rights in property.[12]

The Court disagrees with Trustee's position that a defectively created lien is a "transfer" as that term is defined by § 101(54). Although a "transfer," as defined by § 101(54), includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property," if no valid security interest in the Motorcycle was created, there was no "transfer." By attempting but failing to create a security interest in the Motorcycle, Debtor did not "dispose of or part with property or an interest in property." § 101(54). Consequently, no "transfer" occurred.

Further, the Court is not persuaded by Trustee's argument that the trustee's strong-arm powers exist to invalidate defectively documented security agreements as against the bankruptcy estate. Under § 551, a lien avoided under the trustee's § 544 avoidance powers is automatically preserved for the benefit of the estate. A trustee then steps into the shoes of the creditor whose lien was avoided for the benefit of the estate with respect to enforcement of the lien.[13] There is a difference between an unperfected lien and an invalid lien. If a lien was not actually created, a trustee would reap no benefit for the estate by the exercise of avoidance powers. Avoidance of a

[11] Trustee's Brief in Support of Trustee's Objection to Exemptions and Motion to Compel Turnover of Estate Property, p. 8 (Doc. 58).
[12] *Id.* at p. 7.
[13] A trustee steps in the shoes of the creditor whose lien was avoided for the benefit of the estate with respect to enforcement of the lien but not with respect to contractual obligations of the debtor to the creditor. *In re Haberman*, 516 F.3d 1207, 1210–12 (10th Cir. 2008).

nonexistent lien would leave the trustee with nothing to enforce for the benefit of the estate. Section 544 is not a substitute for an action in which a trustee asks the Court to determine that a lien is invalid. If it is unclear whether a lien is valid, a trustee may commence an action asking for alternative relief: either declare the lien invalid; or, if the lien is valid but unperfected, avoid the lien under § 551 for the benefit of the bankruptcy estate.

## II. Whether Debtor is Judicially Estopped from Denying the Existence of a Security Interest in the Motorcycle

Trustee contends that Debtor is judicially estopped from claiming that he did not create a security interest in the Motorcycle in favor of Mr. Quintana. Judicial estoppel applies in bankruptcy court.[14] Under the doctrine of judicial estoppel, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him."[15] Its purpose is to protect the integrity of the judicial process.[16] "Three factors 'typically inform the decision whether to apply the doctrine [of judicial estoppel] in a particular case[.]'"[17] The three factors are:

> First, a party's subsequent position must be clearly inconsistent with its former position. Next, a court should inquire whether the suspect party succeeded in

[14] *See Queen v. TA Operating, LLC,* 734 F.3d 1081, 1087 (10th Cir. 2013) (applying judicial estoppel in the bankruptcy context). A recent Supreme Court Case, *Keathley v. Buddy Ayers Constr., Inc.*, 146 S. Ct. 1532 (2026) does not hold to the contrary. In that case, the Supreme Court assumed, without deciding, that judicial estoppel applies in the bankruptcy context. *Id*. at 1539. In *Keathley*, two justices, concurring in the result, questioned whether judicial estoppel is a viable doctrine in federal courts. A third justice, concurring in the result, questioned whether judicial estoppel is a viable doctrine in the bankruptcy context. But the Supreme Court did not overrule the well-established application of judicial estoppel in the bankruptcy context in lower federal courts, even though *Keathley* gave it an opportunity to consider the issue. Instead, the Supreme Court remanded for the lower court to apply judicial estoppel in a bankruptcy case using a different evidentiary standard than the lower court had applied.
[15] *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S. Ct. 1808, 1814, 149 L. Ed. 2d 968 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)).
[16] *New Hampshire,* 532 U.S. at 749.
[17] *Queen v. TA Operating*, 734 F.3d at 1087 (quoting *New Hampshire v. Maine*, 532 U.S. at 750).

> persuading a court to accept that party's former position, so that judicial acceptance of an inconsistent position in a later proceeding would create the *perception* that either the first or the second court was misled [.] Finally, the court should inquire whether the party seeking to assert an inconsistent position would gain an unfair advantage in the litigation if not estopped.[18]

These factors are not "inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts."[19]

The Trustee argues that the first factor is satisfied because Debtor's present position that there is no security interest in the Motorcycle is directly contrary to his prior sworn representations in Debtors' bankruptcy Schedules, Statement of Intention, and Amended Schedule. Trustee contends that Debtor has repeatedly represented that Mr. Quintana is a secured creditor and that the debt to Mr. Quintana is secured by a lien on the Motorcycle.

Addressing Debtor's amendment to his schedules to reclassify Mr. Quintana's claim as unsecured, Trustee argues that when schedules are amended, the old schedules are fully subject to consideration by the court as an evidentiary admission, citing *White v. ARCO/Polymers, Inc*., 720 F.2d 1391, 1396 n.5 (5th Cir.1983). However, in *White*, the Fifth Circuit noted that: "Admissions made in superseded pleadings are as a general rule considered to lose their binding force, and to have value only as evidentiary admissions." *Id*. (citing 3 Moore's Federal Practice & Procedure ¶ 15.08[7] at 15-128 (1982)).

Trustee argues that the second factor is satisfied because Debtor's representations were relied upon during the administration of the bankruptcy estate, including in Trustee's lien avoidance action. Trustee contends that he relied on Debtor's representations when he filed the

---

[18] *Queen v. TA Operating,* 734 F.3d at 1087 (quoting *Eastman v. Union Pacific R. Co.*, 493 F.3d 1151, 1156 (10th Cir. 2007)).
[19] *New Hampshire*, 532 U.S. at 751; *Queen,* 734 F.3d at 1087 (same).

Adversary Proceeding against Mr. Quintana and when Mr. Quintana did nothing to contest those representations. Finally, the Trustee argues that the third factor is satisfied because Debtor is seeking an unfair advantage. Specifically, Trustee contends that:

> Debtor seeks to: (1) characterize the debt as secured when convenient; (2) induce Trustee reliance on Debtor's sworn statement to prevent administration of the [Motorcycle] and allow the Debtor to claim a second lower vehicle as exempt with his available vehicle exemption; (3) permit the Trustee to expend estate resources avoiding the lien; and (4) then reverse course and claim the recovered value personally.

In response, Debtor argues that judicial estoppel does not apply because bankruptcy schedules have no preclusive effect, and Debtor therefore had the right to amend the schedules in a way that contradicts the original schedules.

The Court, having considered Trustee's arguments and Debtor's response thereto, concludes that Debtor is not judicially estopped from claiming that he did not create a security interest in the Motorcycle in favor of Mr. Quintana because the Court has not been misled by Debtor's representations. Trustee cannot demonstrate that the Court relied on Debtor's position that Mr. Quintana holds a security interest in the Motorcycle.

Debtor originally scheduled Mr. Quintana as having a secured claim based on his sincere, although erroneous belief, that he had granted Mr. Quintana a valid, perfected lien. Before Trustee commenced the Adversary Proceeding seeking to avoid Mr. Quintana's lien, Debtor amended his schedules to reclassify Mr. Quintana's claim as an unsecured claim. Debtor disclosed in the amended schedule that the reason for the reclassification was that Debtor did not sign a security agreement. In entering a default judgment in the Adversary Proceeding avoiding Mr. Quintana's lien, the Court did not rely on Debtor's classification of Mr. Quintana's claim as secured in the original schedules. Nor did the Court consider whether Mr. Quintana actually held

a lien. The Court avoided the lien in a default judgment entered because Mr. Quintana did not answer or otherwise respond to the complaint seeking to avoid the lien.

Trustee argues that he relied on the original schedules and other filings and the Debtor's testimony at the § 341 meeting when he commenced the Adversary Proceeding even though (i) Debtor amended his schedules to disclose there was no lien before the Trustee commenced the Adversary Proceeding, and (ii) Debtor gave the testimony, which at the time he believed was true, before he amended his schedules. But reliance by the Trustee alone is insufficient. Judicial estoppel requires reliance by the Court. The Court therefore concludes, considering all of the circumstances, that applying judicial estoppel here would not serve the purpose of the doctrine, which is to protect the integrity of the judicial process.

## III. Whether Debtor Waived Any Challenge to the Existence or Effect of the Avoided Lien by Failing to Intervene in the Adversary Proceeding or by Failing to Seek Relief From the Default Judgment

Finally, Truste argues that Debtor, who had notice of the Adversary Proceeding before the Court entered the default judgment avoiding the lien, waived any right to challenge the validity of the lien by failing to intervene in the Adversary Proceeding or seek relief from the Judgment. Trustee contends that Debtor's assertion that no valid lien was created is an impermissible collateral attack of the Judgment. Debtor argues that his assertion that no lien was created in the context of his claim of an exception in the Motorcycle does not constitute a collateral attack of the Judgment because it was a judgment entered by default in a proceeding to which he was not a party.

Trustee chose to name Mr. Quintana as the sole defendant in the Adversary Proceeding and not to name Debtor as a defendant. Because the judgment against Mr. Quintana avoided a lien against the Motorcycle, the Judgment was binding on Mr. Quintana, who, as a result, could

not claim a lien in the bankruptcy case. Mr. Quintana's claim was relegated to the status of an unsecured creditor. But Debtor, who was not a party to the Adversary Proceeding, is not bound by the Judgment that did not consider on the merits whether a lien was created. Debtor, by not intervening in the Adversary Proceeding or seeking relief from the Judgment, did not waive the right to claim no lien was created in the context of his claim of exemption in the Motorcycle. Debtor's claimed exemption in the Motorcycle based on the fact that there is no security interest in the Motorcycle is not a collateral attack on the Judgment, which remains binding on Quintana.

## IV. Conclusion

For the forgoing reasons, the Court overrules the Trustee's objections to Debtor's claim of exemption in the Motorcycle and Debtor's Amended Schedule D and E/F, and denies the Trustee's motion to compel turnover of the motorcycle. The Court will enter a separate order reflecting these rulings.

ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: October 13, 2026

COPY TO:

Nephi D. Hardman
Nephi D. Hardman Attorney at Law, LLC
Attorney for Debtor
500 4th St NW, Ste 102 PMB 3027
Albuquerque, NM 87102

Stuart B. Rodgers
Nach, Rodgers, Hilkert & Santilli
Attorneys for Chapter 7 Trustee
1220 E Osborn Rd, Suite 101
Phoenix, AZ 85014